ROBERT LEON BEANE, JR.,

             Petitioner,            Case No. 1:15-cv-57

v.                                  Honorable Paul L. Maloney

BONITA HOFFNER,

             Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner Robert Beane, Jr., is incarcerated at the Lakeland Correctional Facility (LCF) in Branch County, Michigan. Following a jury trial in the Muskegon County Circuit Court, Petitioner was convicted of armed robbery, MICH. COMP. LAWS § 750.529; and bank robbery, MICH. COMP. LAWS § 750.531. On April 23, 2010, the trial court sentenced him to 24 to 45 years' imprisonment for the armed robbery conviction consecutive with ten to twenty years' imprisonment for the bank robbery conviction. In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

    I.      THE TRIAL COURT ERRED BY REFUSING TO GRANT PETITIONER'S REQUEST TO DISMISS HIS APPOINTED COUNSEL AND TO REPRESENT HIMSELF, THUS DENYING HIS RIGHT UNDER THE U.S. CONSTITUTION.

    II.     PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE

COUNSEL WHEN THE TRIAL COURT [SIC] TO WITHDRAW, AND/OR REPLACE COUNSEL.

III.    PETITIONER WAS DENIED HIS RIGHT OF DUE PROCESS TO BE CONVICTED ONLY ON A SHOWING OF SUFFICIENT EVIDENCE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION.

(Pet. 6-9, ECF No. 1, PageID.6-9.) Respondent has filed an answer to the petition (ECF No. 8) stating that Petitioner's claims are procedurally defaulted or are without merit. Upon review and applying the AEDPA standards, I find that Petitioner's grounds for habeas relief are without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

Petitioner's charges stem from the May 27, 2009, robbery of the Fifth Third bank at 710 Seminole Road in Norton Shores, Michigan. Petitioner received a preliminary examination in Muskegon County District Court on June 29, 2009. At the outset of the hearing, Judge Michael Nolan noted that Petitioner had requested to represent himself. Petitioner stated, however, that at that point he wished to proceed with appointed counsel. (Prelim. Examination Hr'g Tr. 3, ECF No. 9-2, PageID.117.) At the preliminary examination, witness testimony described how Petitioner had entered the bank shortly before noon on May 27, 2009. While he was in the bank, Petitioner repeatedly explained that he possessed an explosive device and proceeded to jump over the counter in front of the bank tellers, and take approximately three thousand dollars from an unlocked drawer. After hearing the testimony, the district court found

probable cause to bind Petitioner over to stand trial on the charges in circuit court. (*Id.* at PageID.135.)

Petitioner was arraigned in Muskegon County Circuit Court on July 6, 2009, at which time he entered a not guilty plea. (Arraignment Hr'g Tr. 5, ECF No. 9-3, PageID.142.) Petitioner was unrepresented by counsel at the hearing. Petitioner noted that he had been appointed an attorney at the preliminary hearing, and thought that counsel was his attorney. (*Id.*) The trial court then appointed counsel for Petitioner. (*Id.* at PageID.143-144.)

A motion hearing was held on February 11, 2010, on several issues. One of the defense motions, filed by Petitioner's appointed counsel, was a request for medical records. The prosecutor did not disagree with the motion, but noted that the prosecution would receive a copy of the materials as well. (2/11/10 Motion Hr'g Tr. 4, ECF No. 9-5, PageID.160.) Petitioner then spoke up and stated he did not want the prosecution to have access to those records. The trial court informed Petitioner that it was his counsel's motion, and he would have to speak privately with his counsel about strategic decisions. (*Id.* at PageID.162-163.)

On March 16, 2010, the trial court heard argument on Petitioner's counsel's motion to withdraw. (3/16/10 Motion Hr'g Tr., ECF No. 9-6, PageID.165.) Petitioner's counsel noted that Petitioner had demanded that he withdraw and that Petitioner desired to be permitted to represent himself. (*Id.* at PageID.167.) When asked by the trial court whether he wanted to represent himself, however, Petitioner replied "[t]hat has never been my contention" and that he was not a lawyer. (*Id.* at PageID.168.) The

prosecutor argued to the trial court that Petitioner, both at the hearing and through the papers he submitted, did not unequivocally state that he wished to represent himself. Instead, Petitioner had only requested that he receive new counsel. (*Id.*) The trial court agreed, and found that Petitioner had not complied with the court rules to waive his right to counsel. (*Id.* at PageID.169.) The conversation then moved to whether Petitioner should receive new counsel. After hearing argument and speaking with Petitioner, the trial court denied Petitioner's counsel's motion to withdraw. (*Id.* at PageID.180-183.)

A few days later, on March 22, 2010, argument was heard on a prosecution motion. (3/22/10 Mot. Hr'g Tr., ECF No. 9-7, PageID.185.) When Petitioner's counsel did not challenge the motion, Petitioner interrupted to object and state that he wished "to invoke my Sixth Amendment to the United States Constitution." (*Id.* at PageID.187.) The presiding officer stopped Petitioner and stated he understood the objection, but that he was not going to hear argument on that. (*Id.*) The court then granted the prosecution's motion and ended the hearing. (*Id.* at PageID.188.)

Thereafter, Petitioner filed a motion to be permitted to represent himself. Argument on Petitioner's motion was heard on April 9, 2010. (4/9/10 Motion Hr'g Tr., ECF No. 9-8, PageID.190.) After a lengthy discussion, the trial court found that Petitioner had not waived his right to counsel. Applying a three-factor test, the trial court noted that Petitioner still had not unequivocally requested to represent himself. (*Id.* at PageID.218.) The court further found that Petitioner's self-representation would not satisfy the third factor, which considered whether a defendant's

self-representation would disrupt, unduly inconvenience, and burden the court and the administration of the court's business. (*Id.* at PageID.218-219.)

Trial in this case began on April 20, 2010, before a Muskegon County Circuit Court jury. (Trial Tr. I, ECF No. 9-9, PageID.227.) The prosecution began its case-in-chief by calling June Kamp to the stand. (Trial Tr. I, ECF No. 9-9, PageID.402.) Ms. Kamp testified that, on May 27, 2009, she was employed as a teller at the Fifth Third bank located on Seminole Road in Norton Shores.[1] (*Id.* at PageID.405.) As a teller, Ms. Kamp had received training in handling bank robberies. (*Id.* at PageID.407.)

At approximately 11:45 a.m. that morning, Ms. Kamp was speaking with another teller, Brian Forton, at his teller window. (*Id.* at PageID.405-406.) While they were speaking, the two heard someone yelling, but were unable to make out what was being said. (*Id.* at PageID.407.) She looked over, and saw a male individual in the lobby who was pulling a cap down over his sunglasses. She was then able to hear him yell "I've got a bomb, I've got a bomb, I've got a fucking bomb." (*Id.* at PageID.408.) She testified he may have also said "don't fuck with me, I've got a bomb." (*Id.*) Ms. Kamp testified that she began to slowly back away. She stated she felt surprised, and was not quite sure what was going on. (*Id.*) Things became more clear, however, when the individual jumped over the teller counter to the teller side. (*Id.*) Ms. Kamp testified she became afraid and she thought about going into the vault room. She

---

[1] Fifth Third assigned its tellers the title of "customer service representative."

testified it had a metal door, and she thought it might provide some protection against a bomb blast. (*Id.* at PageID.409.)

After the individual jumped over the counter, Ms. Kamp saw him pull on the teller drawers. While his back was turned to Ms. Kamp, she saw him make a scooping motion at Brian Forton's drawer, and she noted it was the only drawer that had been open at the time. (*Id.* at PageID.409-410.) Later, she saw the drawer and noticed it was empty. (*Id.* at PageID.410.) The individual then moved down the line of teller drawers and towards the exit. Ms. Kamp moved in the opposite direction and towards her window. Thereafter she saw the individual exit the bank and get on a bike. (*Id.* at PageID.411-412.)

After the individual left, Ms. Kamp pushed an alarm button and the bank locked its doors. Ms. Kamp placed caution tape around the areas she had seen the individual walk through. (*Id.* at PageID.412.) When the police arrived, she told them what she had seen and heard. (*Id.* at PageID.413.) Finally, the prosecution asked whether she recognized the individual who robbed the bank in the courtroom, and Ms. Kamp identified Petitioner as that individual. She stated that she recognized him because she had reviewed a security videotape of the incident. (*Id.* at PageID.414.)

Officer Todd Swanker testified that he received an alert tone from his dispatch about a robbery at the Fifth Third bank on Seminole Road. (Trial Tr. I, ECF No. 9-9, PageID.423.) On his way to the bank, the officer asked dispatch to verify that the report was valid. Dispatch called the bank and verified that there had been a robbery. The dispatch also relayed a description of the suspect as a black male, wearing a

charcoal suit, and riding a bicycle. (*Id.* at PageID.428.) On his way to the bank, the officer looked for an individual matching that description, but was unable to find one. (*Id.*) The officer proceeded to the bank, and he testified he was one of the first officers on the scene. (*Id.* at PageID.427.) Officer Swanker testified that once he arrived, his role was to interview those who were working at the bank when the robbery occurred, and afterwards he prepared a report. (*Id.* at PageID.430.) Several of the witnesses reported to him that the suspect had yelled he had a bomb. (*Id.* at pageID.436.)

Brian Forton testified that he was employed as a teller at the Fifth Third bank on Seminole Road. On the morning of May 27, 2009, he was speaking with June Kamp on their side of the teller windows. (Trial Tr. I, ECF No. 9-9, PageID.446.) While they were speaking, he heard an individual enter the bank and begin to speak loudly, but Mr. Forton did not immediately understand what the individual was saying. (*Id.* at PageID.447.) When Mr. Forton looked up, he saw an individual coming towards them at a quick pace. Mr. Forton then heard the individual clearly exclaim "I have a bomb, I have a bomb, get the fuck away, I have a bomb." (*Id.* at PageID.447.) When the individual put his hands on the teller counter and jumped over it, Mr. Forton testified that he thought he should do what the individual said and backed away from his station. (*Id.*) Mr. Forton testified that he did not push an alarm button because by the time he thought about it, the individual had already jumped over the counter. (*Id.* at PageID.448.) Mr. Forton further testified that once the man entered the teller area, he realized he was in a confined area and went to a door at the end of the teller line that led into the lobby area. (*Id.* at PageID.449.) As he backed away, Mr. Forton saw

Petitioner open his teller drawer and reach inside it. (*Id.* at PageID.451.) The robber followed Mr. Forton out the door into the lobby and then ran to the front door and exited the bank. (*Id.* at PageID.453.) Mr. Forton testified he could see the robber get on a bike and head west. (*Id.*) After the robber left, Mr. Forton went back to look at his drawer. All the money inside it was missing, and a dye pack that had been inside the drawer was also missing. (*Id.* at PageID.455.)

William Kordupel, the manager of the Fifth Third bank on Seminole Road, testified, that on the day of the incident he was in his office at the bank and working at his computer. (Trial Tr. II, ECF No. 9-10, PageID.496.) He testified that he heard an unusually loud voice, and looked from his seat out into the lobby. When he did so, he saw a man coming towards the teller station and yelling, "I got a bomb, get the fuck down." (*Id.* at PageID.496-497.) He identified the individual as an African American male, roughly 5'7" or 5'8" in height and wearing a dark coat and pants, as well as a hat and sunglasses. (*Id.* at PageID.498.)

Mr. Kordupel testified that the man then jumped over the teller counter. (*Id.* at PageID.500.) After that, his view became obstructed, and the manager stated the bank's policy during these events was to stay in place, so the manager did not move from his seat. (*Id.*) Mr. Kordupel also testified that he had an alarm button in his office, but that the bank's policy was not to push it until after the robber had left. (*Id.* at PageID.501.) The prosecution then played footage from the bank's security cameras. (*Id.* at PageID.503.) During this testimony, the parties also stipulated that $3,066 was

stolen from the bank and $2,533 was recovered, leaving an outstanding amount of $533. (*Id.* at PageID.518.)

Teresa McDaniel testified that she was the customer services manager of the Fifth Third bank on Seminole Road. (Trial Tr. II, ECF No. 9-10, PageID.551.) She was working in her office on the date in question and testified she heard an individual yell "I've got a fucking bomb, I'm not kidding, I've got a fucking bomb." (*Id.* at PageID.554.) She saw him jump over the teller counter and make a pulling motion near the teller drawers. (*Id.*) She described the individual as a black male, wearing all black clothing, with a black ski cap and sunglasses. (*Id.* at PageID.555.) She also saw Brian Forton open the door from the teller area into the lobby. (*Id.*) The last thing she saw was the individual exit the bank. (*Id.* at PageID.557.)

Kevin Clark testified that he was an employee of Art Van Furniture. (Trial Tr. II, ECF No. 9-10, PageID.572-573.) On the date in question, Mr. Clark was parking his car on the way back from his lunch break when he noticed a few twenty-dollar bills on the ground. (*Id.* at PageID.574.) He further noticed that the bills had red dye on them. (*Id.*) Mr. Clark picked the bills up and took them into work with him, thinking that they might belong to a coworker. (*Id.* at PageID.575.) But he later met up with a police officer and turned the bills over to the officer. He showed the officer where he found the bills and assisted the police in looking for more bills in the area. (*Id.*)

Ryan Beishuizen testified that he was an investment advisor at the Fifth Third bank on Seminole Road. (Trial Tr. II, ECF No. 9-10, PageID.578.) He was on the telephone in his office when he heard a loud voice yelling "get the fuck back, I have a

bomb, I have a bomb." (*Id.* at PageID.579.) Mr. Beishuizen looked out of his office and saw an individual jumping over the teller counter. He described the individual as an African American, wearing dark clothing and 5'8" in height. (*Id.*) After that Mr. Beishuizen ducked back into his office to text his wife, who was on her way to pick him up, to tell her not to come. (*Id.*)

Emmitt Boxley testified that he lived in Lake County and knew Petitioner. (Trial Tr. II, ECF No. 9-10, PageID.587.) People would come and play dominos and cards at his house, and Petitioner was one of those who would visit. (*Id.*) Mr. Boxley testified that on one occasion, he saw Petitioner with some money that looked wet and stained with an orange-reddish color. Petitioner told him he had spilled some Kool-Aid on it. (*Id.* at PageID.588.)

Ben Childress testified that he played dominos and cards while watching the basketball playoffs at Mr. Boxley's house. (Trial Tr. II, ECF No. 9-10, PageID.604–605.) Petitioner was also there, and Mr. Childress testified he saw Petitioner with some cash that was red colored. Petitioner told him that he had spilled some Kool-Aid on it. (*Id.* at PageID.606.) Mr. Childress won $40 of Petitioner's money while playing cards. (*Id.* at PageID.606.). He spent $20 dollars at a gas station and turned the other $20 over to the police. (*Id.*) Mr. Childress also testified that the morning after they played cards, Petitioner asked Mr. Childress to drive him to a bus station in Grand Rapids. (*Id.* at PageID.608.) At the bus station, Mr. Childress saw Petitioner purchase a ticket using some of the marked money. (*Id.* at PageID.609.)

Patrick Wittkopp, a commercial loan officer at the Fifth Third bank on Seminole Road, testified that he was in his downstairs office on the date in question when he heard yelling coming from the upstairs. (Trial Tr. II, ECF No. 9-10, PageID.618.) He heard someone yell "I have a bomb, I have a fucking bomb." (*Id.*) He got up and left the bank with some others out the back door. (*Id.*) Outside, he saw an African American male on a bike. (*Id.* at PageID.619-620.) The man rode west on the bike, and Mr. Wittkopp noticed a red dye packet explode near the individual's waist. (*Id.* at PageID.620.) The man then pulled some money out of his pants and threw it on the ground. (*Id.*) Soon after, the individual turned around and headed towards Mr. Wittkopp. Mr. Wittkopp did not confront the individual, however, due to the bank's policy. (*Id.* at PageID.621.) Mr. Wittkopp then saw four to six other individuals picking up the money that the man had thrown down. Mr. Wittkopp told them to put the money back down because he believed it was involved in a bank robbery. (*Id.* at PageID.622.) He remained there until the police came to collect the cash. (*Id.*)

Russell Zue, an employee at Art Van Furniture, testified that on the morning of the date in question he was taking some garbage out to the dumpster. (Trial Tr. II, ECF No. 9-10, PageID.628.) While doing so, he saw a male on a bike coming to a stop. The individual was dressed in black and wearing sunglasses and coat. (*Id.*) It appeared he was headed towards the Fifth Third bank. (*Id.* at PageID.629.) Mr. Zue testified he was suspicious because the man was wearing a coat when it was rather warm outside. (*Id.*) About thirty minutes later, the police showed a surveillance photo

to Mr. Zue. Mr. Zue identified the individual in the photo as the man he saw riding the bike. (*Id.* at PageID.630.)

Jennifer Geisler, a Fifth-Third Bank customer service representative, testified that she was working May 27, 2009, when someone came in and stated, in a loud manner, "I've got the fucking bomb" four or five times. (Trial Tr. II, ECF No. 9-10, PageID.634.) She testified she saw an African American gentleman, wearing black clothing and a black cap, walking at a fast pace towards the teller counter. (*Id.* at PageID.635-636.) She saw him climb over the teller counter, and head down the teller line towards the exit. (*Id.* at PageID.636.) She then saw the individual leave the bank and get onto a bicycle. (*Id.*)

Officer Javier Martinez testified that he was on patrol during the date in question when a call went out concerning a robbery at the Fifth Third bank. (Trial Tr. II, ECF No. 9-10, PageID.645.) The officer drove to the bank, specifically towards the back of the bank adjacent to a Rite-Aid. (*Id.* at PageID.647.) As he pulled up, he saw some paper money that appeared to have been tinted with red paint blowing in the wind. (*Id.* at PageID.648.) Officer Martinez made contact with some employees from Art Van, and in searching that area recovered an additional amount of red tinted paper money. (*Id.* at PageID.651.) Officer Martinez also received a call from Lieutenant John Gale who had located some cash in a third area, and went to help him collect that money. (*Id.* at PageID.652-653.) There he recovered the spent dye packet. (*Id.* at PageID.653-654.)

Ruth Donahue, a fraud investigator for Fifth Third bank, testified that she performed an investigation of the May 27, 2009, incident at the Seminole Road branch. (Trial Tr. III, ECF No. 9-11, PageID.666-667.) She did an audit of the cash that was missing and found that $3,066 was missing from the bank. (*Id.* at PageID.667.) She also prepared a DVD of the surveillance video from the bank, and testified that she turned a copy of the DVD over to the Norton Shores Police department. (*Id.*) She testified that the video was made up of a series of still frames. (*Id.* at PageID.668.) She further testified that the videos were trained on the general public areas of the bank, and not on the employee areas. (*Id.* at PageID.669.)

Lieutenant Timothy LaVigne testified that he participated in the interview of Petitioner on June 16, 2009. (Trial Tr. III, ECF No. 9-11, PageID.679.) Petitioner made a few statements regarding the economy and that he was drunk. He said he never set out to hurt anybody. (*Id.* at PageID.680.) Thereafter he started talking about an attorney. (*Id.*) On June 24, 2009, the lieutenant returned to the jail after being told that Petitioner wished to speak with him. (*Id.* at PageID.681.) Petitioner repeated that he had never hurt anyone in his life, that he just wanted to "get this over with" which the lieutenant understood to be referring to the time Petitioner would spend in prison. Petitioner further told the lieutenant that he thought the surveillance tape had been altered because he had covered his face before entering the bank. (*Id.* at PageID.682.) Petitioner stated he was only at the bank for a short time, and he denied stating he possessed a bomb. (*Id.*)

The lieutenant also participated in the count of the paper money. He testified it was difficult because some of the money became damaged when the dye pack exploded. (*Id.* at PageID.683.) It was also difficult because there was money that was found in several locations. It was being blown about in the wind, and there were members of the public attempting to pick some of the money up. (*Id.*)

Detective Lori Sinclair testified she spoke with bank personnel and examined video and still photos to determine where Petitioner may have left fingerprints at the bank. (Trial Tr. III, ECF No. 9-11, PageID.691.) She was able to lift two large palm prints from two teller stations. (*Id.* at PageID.700.) She also obtained a known palm print of Petitioner. (*Id.* at PageID.703.) She then submitted the prints to the state crime lab for comparison. (*Id.* at PageID.703.) The lab's report found a match between Petitioner's known print and the left palm latent print recovered from the bank. (*Id.* at PageID.705.)

Lake County Sheriff Robert Hilts testified that he met with Detective Anthony Nanna, a Norton Shores detective, regarding the investigation into the Fifth Third bank robbery. (Trial Tr. III, ECF No. 9-11, PageID.724.) He testified that Ben Childress gave him a $20 bill that was partially covered in a pink, reddish dye. The sheriff met with the detective and turned the marked cash over to him. (*Id.* at PageID.725.)

Detective Anthony Nanna testified that he interviewed Petitioner with Detective LaVigne on June 16, 2009, at the Muskegon County Jail. (Trial Tr. III, ECF No. 9-11, PageID.727.) He testified that they told Petitioner they knew he robbed the bank, but

wanted to get his side of the story and why he did it. Petitioner stated that the economy was bad, and that he didn't mean to get anyone hurt. (*Id.*) He also stated he did not remember much from that day because he had been drinking. (*Id.*) Thereafter, the detective met with Sheriff Hilts and was given a $20 bill that was stained with red dye. (*Id.* at PageID.728.) He also visited a separate bank and was given eight $20 bills that the bank had received from various businesses. Those bills all had red dye on them. (*Id.*) Thereafter, the prosecution rested. (PageID.736.)

The defense began its presentation by calling Petitioner to the stand. (Trial Tr. III, ECF No. 9-11, PageID.754.) Petitioner testified that, during May 2009, he was living with his son and his son's mother. (*Id.* at PageID.755.) Petitioner admitted he had previously been convicted of second degree home invasion and unlawful use of a motor vehicle. (*Id.* at PageID.760-761.) He testified that on the date in question he received a ride into Muskegon in order to pick up some money as payment for doing some work. (*Id.* at PageID.761.) He did not get paid, and he and his ride needed gas money. He noticed a bike in the back of the truck he was in, and thought about going to ask his manager at Michigan Works for some gas money. (*Id.* at PageID.762.) He took the bike and started to ride it towards the Fifth Third bank. (*Id.* at PageID.762-763.) Instead of proceeding to Michigan Works, however Petitioner decided to go to the bank and snatch some money. (*Id.* at PageID.763.) While he admitted being the individual entering the bank, Petitioner denied yelling that he had a bomb. Instead he said that he was merely reminding himself not to get a "bomb pack," that is, the aforementioned dye pack. (*Id.* at PageID.765-767.) Petitioner testified that, after

getting the money, he went back to the truck and drove away. (*Id.* at PageID.771.) Petitioner testified that he also owed money to Ben Childress. Mr. Childress had made it known that Petitioner should pay his debt, or he would come to Petitioner's house. (*Id.* at PageID.771.) Petitioner testified he gave Mr. Childress $400 of the money he took from the bank. (*Id.*)

The defense next called Officer Swanker. (*Id.* at PageID.773.) Officer Swanker testified he spoke to several witnesses at the bank. Jennifer Geisler told him that the individual stated he had a bomb. (Trial Tr. III, ECF No. 9-11, PageID.776.) Ryan Beishuizen told the officer he saw an individual at the front door, heard the individual say he had a bomb, and observed him jumping over the front counter of the bank. (*Id.* at PageID.778.) After that, the defense rested.

The prosecution recalled Detective Sinclair and talked about her examination of the truck. (Trial Tr. III, ECF No. 791.) She noticed a faded red stain in the truck that appeared to have been washed. There was also a bottle of stain remover in the back of the truck. (*Id.* at PageID.793.)

On the fourth day of trial, the jury received its instructions and heard closing arguments. After deliberating for fifty-three minutes, the jury returned a guilty verdict on the two counts. (Trial Tr. IV, ECF No. 9-12, PageID.868-872.) Petitioner was sentenced on May 17, 2010, as an habitual offender, fourth offense, to 24 to 45 years' imprisonment on the armed robbery charge and ten to twenty year's imprisonment on the bank robbery charge. (Sentencing Hr'g, ECF No. 9-14, PageID.953-954.)

## B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on December 17, 2010, raised a single issue:

I.  DID THE COURT ERR BY REFUSING TO GRANT DEFENDANT'S REQUEST TO DISMISS HIS APPOINTED COUNSEL AND TO REPRESENT HIMSELF?

(*See* Def.-Appellant's Br. on Appeal, ECF No. 9-17, PageID.1124.) Petitioner also filed a Standard 4 brief, dated March 2, 2011, raising three additional claims:

II.  WAS THE DEFENDANT-APPELLANT DENIED HIS FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND MICHIGAN CONSTITUTION ARTICLE 1 SEC. 17, RIGHT TO DUE PROCESS, WHEN THERE WAS AN INSTANCE OF PROSECUTORIAL MISCONDUCT CAUSED BY THE STATE'S FAILURE TO DISCLOSE TO DEFENDANT-APPELLANT RELEVANT EVIDENCE RELATED TO ALL VIDEO CAMERAS AND FAILING TO TOTALLY COMPLY WITH A COURT MANDATED DISCOVERY ORDER?

III.  WAS THE DEFENDANT-APPELLANT DENIED HIS RIGHT TO THE DUE PROCESS AS PROVIDED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AMD MICHIGAN CONSTITUTION ART. I SEC. 17, WHERE THERE IS INSUFFICIENT EVIDENCE TO SUPPORT AND SUSTAIN HIS CONVICTION OF ARMED ROBBERY?

IV.  WAS THE DEFENDANT-APPELLANT DENIED HIS SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND MICHIGAN CONSTITUTION ART. 1 SECT. 20, WHEN HE WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL'S CUMULATIVE ERRORS DENIED THE DEFENDANT-APPELLANT A FAIR TRIAL, WHICH INCLUDED (A) FAILURE TO PRESENT A DEFENSE TO THE OFFENSE OF ARMED ROBBERY; (B) FAILED TO PROPERLY IMPEACH MULTIPLE WITNESSES; (C) FAILED TO OBTAIN EXCULPATORY VIDEO EVIDENCE; (D) FAILED TO PROPERLY PRESENT

CHALLENGES TO THE FAIR CROSS SECTION OF THE COMMUNITY REQUIREMENT IN THE JURY VENIRE?

(Def.-Appellant's Standard 4 Br., ECF No. 9-17, PageID.1152.) By unpublished opinion issued on September 8, 2011, the Michigan Court of Appeals rejected all of Petitioner's appellate arguments and affirmed his sentences. (*See* 9/8/11 Mich. Ct. App. Op. (MCOA Op.), ECF No. 9-17, PageID.1112-1116.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same claims raised before and rejected by the Michigan Court of Appeals, along with two additional claims:

> V. WAS THE DEFENDANT-APPELLANT DENIED HIS SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATE[S] CONSTITUTION AND MICHIGAN CONST. ART. 1 SECT 20 WHEN HE WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHERE APPELLATE COUNSEL ABANDONED SEVERAL ISSUES NOR PROVIDED PROTECTION OF APPELLANTS RIGHT TO REVIEW?

> VI. WAS DEFENDANTS FIFTH AND FOURTEENTH AMEND. RIGHT TO DUE PROCESS VIOLATED WHEN THE TRIAL JUDGE REFUSED TO ACKNOWLEDGE DEFENDANTS "TIMELY" REQUEST TO RECUSE HIMSELF?

(*See* Def.-Appellant's Pro Per App. for Leave to Appeal, ECF No. 9-18, PageID.1235-1242.) By order entered May 21, 2012, the Michigan Supreme Court denied Petitioner's application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* 5/21/2012 Mich. Ord., ECF 9-18, PageID.1193.)

## C. Post-Conviction Relief

Petitioner did not appeal to the United States Supreme Court. Instead he returned to the trial court by filing a motion for relief from judgment asserting the following claims:

> VII. THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT REFUSED TO ACKNOWLEDGE DEFENDANT BEANE[']S TIMELY REQUEST TO RECUSE HIMSELF ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL.
>
> VIII. THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS CONSTITUTIONAL RIGHTS UNDER THE UNITED STATES CONSTITUTIONAL AMEND VI, XIV AND MICHIGAN CONSTITUTION 1963, ART 1, SEC 20 TO THE EFFECTIVE ASSISTANCE OF (A) TRIAL COUNSEL, AND (B) APPELLATE COUNSEL WHEN IT DENIED THE DEFENDANTS REQUEST TO REPLACE BOTH TRIAL AND APPELLATE COUNSELS.
>
> IX. THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION AND OTHER PROTECTED RIGHT'S UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHERE THE TRIAL COURT TURNED THE VIDEO AND AUDIO RECORDING EQUIPMENT OFF PREVENTING A COMPLETE AND RELIABLE RECORD FOR APPELLATE REVIEW.

(*See* Mot. for Relief from J., ECF No. 9-15, PageID.958-1017.) In an order issued on September 25, 2013, the trial court denied the motion under MICH. CT. R. 6.508(D). (ECF No. 9-16; PageID. 1108-11.) Petitioner appealed the trial court's decision to the Michigan Court of Appeals. In an order dated May 9, 2014, however, the court of appeals denied Petitioner's application for leave to appeal, citing MICH. CT. R. 6.508(D). (5/9/14 MCOA Op., ECF No. 9-19, PageID.1347.) Petitioner appealed that decision to

the Michigan Supreme Court, but the court denied leave to appeal, citing MICH. CT. R. 6.508(D).  (12/30/2014 Mich. Ord., ECF 9-20, PageID.1480.)

Petitioner filed the instant action requesting habeas relief on January 22, 2015. (ECF No. 1.)  This case is ripe for decision.

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly

established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.

*See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.     Self-Representation

In his first ground for habeas relief, Petitioner contends that the trial court erred when it refused to permit Petitioner to represent himself at trial.

The Sixth Amendment provides that a criminal defendant shall have the right to the assistance of counsel for his defense. U.S. Const. amend. VI. In *Faretta v. California*, 422 U.S. 806 (1975), the Supreme Court recognized a corollary constitutional right "to proceed without counsel when [a defendant] voluntarily and intelligently elects to do so." *Id.* at 807. "The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense . . . . Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Id.* at 819-20 (footnote omitted). "The Sixth Amendment right of self-representation differs from other constitutional rights because it can not be exercised without the concomitant waiver of another fundamental right that is also guaranteed under the Sixth Amendment; the right to counsel." *Buhl v. Cooksey*, 233 F.3d 783, 789 (3d Cir. 2000) (quoted in *Pouncy v. Palmer*, 846 F.3d 144, 160 (6th Cir. 2017)).

Given the importance of the right to counsel, however, a defendant's request for self-representation must be unequivocal and his waiver of his right to counsel and the decision to proceed *pro se* must be knowing, voluntary and intelligent. *See Faretta*, 422 U.S. at 834-35; *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938). For any such waiver to be effective, the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835. (citation omitted). Whether a defendant's choice was made with "eyes open" generally "depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Zerbst*, 304 U.S. at 464-65. The Supreme Court has "not prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel," *Iowa v. Tovar*, 541 U.S. 77, 88 (2004), and there is "no sacrosanct litany for warning defendants against waiving the right to counsel."[2] *United States v. Jones*, 421 F.3d 359, 363 (5th Cir. 2005). Less rigorous warnings are required before trial than at trial "because, at that stage, 'the full

---

[2] The Court notes that the Sixth Circuit requires federal district courts within the circuit to conduct an inquiry as set forth in the Bench Book for United States District Judges 1:02-2 (3d ed. 1986) before accepting a waiver of a right to an attorney. *King v. Bobby*, 433 F.3d 483, 492 (6th Cir. 2006); *United States v. McDowell*, 814 F.2d 245, 250 (6th Cir. 1987). However, this type of formal, detailed inquiry is not required by clear Supreme Court precedent. *King*, 433 F.3d at 492. Accordingly, in the context of federal habeas review, there is no script that a state court must follow in determining whether a criminal defendant has made a "knowing, voluntary, and intelligent" waiver of counsel. *Id.* Rather, the state court must reasonably apply Supreme Court precedent, which requires looking at the "whole record" to determine if the defendant made a knowing and intelligent waiver. *Id.*

dangers and disadvantages of self-representation . . . are less substantial and more obvious to an accused than they are at trial.'" *Tovar*, 541 U.S. at 90 (quoting *Patterson v. Illinois*, 487 U.S. 285, 299 (1988)).

In addition, the Supreme Court has recognized that the right to self-representation "'is not absolute.'" *Indiana v. Edwards*, 554 U.S. 164, 171 (2008) (holding that in the context of prior issues of mental competency may permit a state to limit the right of self-representation) (quoting *Martinez v. Ct. of Appeal of Cal.*, 528 U.S. 152, 162 (2000)). As the *Faretta* Court itself observed, "[t]he right of self-representation is not a license to abuse the dignity of the courtroom." 422 U.S. at 834 n.46 (internal quotation omitted). "[T]he government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Martinez*, 528 U.S. at 162 (holding that the right of self-representation does not apply on direct appeal in a criminal case). For example, courts may require that a defendant make his request to represent himself in a timely fashion. *Id.*; *see also Hill v. Curtin*, 792 F.3d 760, 767 (6th Cir. 2015) (en banc) (finding state court's denial of untimely request for self-representation to be a reasonable application of clearly established Supreme Court precedent). In addition, a court may appoint standby counsel even without the express consent of the defendant. *Id.* Nevertheless, a court is not required to appoint standby counsel or permit "hybrid" representation. *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984). Further, the trial judge need not provide personal instruction on procedure or otherwise assist the defendant. *Id.* (citing *McKaskle*, 465 U.S. at 183-84). Moreover, the trial judge may

terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. *Faretta*, 422 U.S. at 834 n.46 (citing *Illinois v. Allen*, 397 U.S. 337, 342 (1970) (holding that a defendant's right to confront witnesses may be overcome by the defendant's engagement in disruptive conduct)).

Finally, "[s]ince the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless." *McKaskle*, 465 U.S. at 177 n.8; *see also Washington v. Renico*, 455 F.3d 722, 734 (6th Cir. 2006) (holding that "denial of the *Faretta* right is a structural error for which [defendant] need not show any prejudice") (citing *McKaskle*, 465 U.S. at 177 n.8).

Here, the Michigan Court of Appeals held that Petitioner never made an unequivocal request for self-representation. It further found the trial court's determination that Petitioner would be disruptive if he were permitted to represent himself was supported by the record:

> In this case, defendant requested to represent himself, and after a hearing on the matter, the trial court denied defendant's request. During the hearing, defendant stated that he wanted to represent himself but that he also wanted to preserve a claim of ineffective assistance of counsel for appeal. Defendant also stated that he had not anticipated representing himself, and that representing himself would be "crazy." The trial court found that defendant's waiver was equivocal and that defendant would be disruptive if permitted to represent himself. This latter finding was based on defendant's behavior throughout the pendency of the case and during the trial of his codefendant. An appellate court is "not free to simply substitute its view for that of the trial court, but must be careful to respect the trial court's role in determining factual issues and issues of credibility." *Williams,* 470 Mich

- 26 -

> at 641. On the record before us, we find that the trial court's findings that defendant's waiver was equivocal and that defendant would be disruptive are supported by the record. Accordingly, the trial court did not err in denying defendant's request to represent himself.

(*See* 9/8/11 MCOA Op., ECF No. 9-17, PageID.1112-1113.) Although the court of appeals relied upon Michigan cases in reaching its decision, those cases specifically rely upon federal law. *See Russell*, 684 N.W.2d at 187-92 (discussing *Faretta*, 422 U.S. 806, and holding that *Anderson*, 247 N.W.2d 857, incorporated the *Faretta* standard into Michigan law).

The court of appeals' decision was both legally and factually reasonable. Petitioner's argument did not constitute an unequivocal request to represent himself in the trial proceedings. Instead, at the first hearing on counsel's motion to withdraw, Petitioner made several limiting statements. As I noted in the above discussion of the trial proceedings, Petitioner told the trial court judge that it was never his intention to represent himself. (3/16/2010 Mot. Hr'g, ECF No. 9-6, PageID.168.) Indeed, most of his statements made at the hearing related to complaints against his relationship with his court appointed counsel, not any assertive statements that he wished to represent himself. (*Id.* at PageID.175-180.) At a second hearing, Petitioner continued to make statements that are inconsistent with an unequivocal request for self-representation. For example, Petitioner made it clear he wished to preserve a claim of ineffective assistance. (4/9/10 Mot. Hr'g, ECF No. 9-8, PageID.192-193.) Other nebulous statements include "if I do elect to represent myself" (PageID.193) and "[r]epresenting yourself in a situation like this, it's, it's crazy[.]" (PageID.197.)

After hearing these statements, the trial court denied Petitioner's motion for self representation. It found that Petitioner had not unequivocally requested to represent himself. Furthermore, relying in large part on Petitioner's conduct during the trial of his codefendant, the court found that allowing Petitioner to represent himself would be disruptive to the proceedings. (*Id.* at PageID.216-220.)

The Michigan Court of Appeals' decision on this issue did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The court of appeals' decision is entitled to a presumption of correctness, which Petitioner has the burden of rebutting by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. Petitioner utterly fails to meet that burden. Even if the Court assumes he unequivocally requested counsel, the Court's determination that Petitioner would likely disrupt the proceedings was also eminently reasonable, and Petitioner has not shown otherwise by clear and convincing evidence. Accordingly, this ground for habeas relief should be denied.

### 2. Ineffective Assistance

In his second ground for habeas relief, Petitioner contends that his trial counsel rendered ineffective assistance in several respects. First, Petitioner alleges that his counsel failed to challenge whether the jury constituted a fair cross section. In his second and fourth contentions, Petitioner alleges his trial counsel was ineffective in

failing to investigate and obtain still photos and videos from all of the bank's surveillance cameras.  Third, Petitioner contends that his counsel abandoned him when he testified during the separate trial of his co-defendant.  Finally, Petitioner appears to contend that his counsel was ineffective when Petitioner was charged with bank robbery.  Petitioner also claims his appellate counsel rendered deficient performance.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court

determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

### A. Trial Counsel

As is noted above, Petitioner makes several contentions concerning the performance of his trial counsel. For the reasons laid out below, however, Petitioner is not entitled to relief.

### (1) Fair Cross-Section

Petitioner, an African-American, argues that his counsel was unprepared to challenge the racial make up of the jury at his trial and accordingly he was denied his Sixth Amendment right to an impartial jury drawn from a fair cross-section of the community. Specifically, Petitioner appears to contend that his counsel should have

more fully reviewed the United States Supreme Court case *Berghuis v. Smith*, 559 U.S. 314 (2010), and been prepared with supporting statistics and evidence to argue his motion.

The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis*, 559 U.S. at 319 (citing *Taylor v. Louisiana*, 419 U.S. 522 (1975)). In order to establish a prima facie violation of the fair-cross-section requirement, a defendant must demonstrate three elements: (1) that the group alleged to be excluded is a "distinctive group" in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979). When potential jurors are systematically excluded from the jury pool on the basis of race, structural error occurs. *Vasquez v. Hillery*, 474 U.S. 254, 263–64 (1986). Structural error is not subject to harmless-error review. *United States v. Gonzalez–Lopez*, 548 U.S. 140, 148–49 (2006) (citing *Arizona v. Fulminante*, 499 U.S. 279, 309–310 (1991)).

At the beginning of trial in this case, Petitioner's counsel filed a motion to challenge the jury array. (Trial Tr. I, ECF No. 9-9, PageID.229.) Counsel stated he saw the prospective jury members walking into the courthouse and did not see an African American individual among them. (*Id.*) The trial court allowed both the prosecutor and defense counsel to go down to the jury room to view all the prospective

jurors. While there were apparently several minorities present, the parties were unable to determine who was there for Petitioner's case. The trial court proceeded with the case and allowed jury selection to continue, but before swearing in the jury panel, heard argument on Petitioner's motion. (*Id.* at PageID.363.) Petitioner's counsel then introduced census data from the year 2000 that showed that 14.2 percent of Muskegon County residents identified as African American. (*Id.* at PageID.364.) Counsel then expressed dissatisfaction with the current method for calling prospective jurors and requested a mistrial. When asked if a mistrial would solve the issue, counsel responded that it would be a "case by case thing." (*Id.* at PageID.367.) The court determined that Petitioner failed to satisfy his burden for a mistrial. On review, the Michigan Court of Appeals found that Petitioner's counsel had not rendered ineffective assistance:

> Defendant next argues that defense counsel was ineffective because of how he handled the jury fair cross-section challenge. On the first day of trial, defense counsel moved to challenge the jury array. The trial court denied the motion, explaining that there was no proof of systematic exclusion because there was no evidence regarding the jury pool selection process. Defendant argues that defense counsel did not adequately challenge the jury cross-section because counsel failed to research the law before filing his motion. Specifically defendant argues that counsel should have investigated *Berghuis v Smith,* US _; 130 S Ct 1382; 176 L Ed 2d 249 (2010), before arguing the motion. However, defense counsel did address *Berghuis* in his argument, which competently addressed the relevant law regarding cross-section challenges. To the extent defendant is arguing that counsel should have produced evidence of the systematic exclusion of African-Americans, defendant has failed to establish a factual predicate for his claim. *Hoag,* 460 Mich at 6. Specifically, the record does not support that such evidence exists. Thus, defense counsel was not ineffective based on his motion challenging the cross-section of the jury pool.

(9/8/11 MCOA Op., ECF No. 9-17, PageID.1115.) Petitioner has failed to show that the decision of the Michigan Court of Appeals, rejecting this claim of ineffective assistance of trial counsel, was "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" under the "doubly deferential" standard of review. 28 U.S.C. § 2254(d)(1). Although the court of appeals relied upon state court authority, the standard applied is the same as the *Strickland* standard. (*See* PageID.1114.) Thus it cannot be said that the state court's decision is contrary to clearly established federal law as set forth in *Strickland*.

Moreover, the state court applied the test reasonably. In some instances, Petitioner simply mischaracterizes his counsel's performance. Contrary to Petitioner's assertion, it appears that his counsel was well versed in the *Berghuis* decision and was able to adequately argue it to the court. Furthermore, Petitioner fails to demonstrate that there was some aspect to that case that his counsel should have known about and failed to properly address. Moreover, it is not the case that his counsel did not supplement his argument with statistics. To the contrary, Petitioner's counsel explicitly referenced United States census data. To the extent Petitioner argues his counsel should have referenced other data, Petitioner has not shown that underrepresentation resulted from a systematic exclusion of African-Americans in the jury selection process.

To succeed on this claim, Petitioner must show not only that the distinctive group in question was insufficiently represented on the venire from which his jury was selected, but also that such was the case in other venires as well. *See Duren*, 439 U.S.

at 366 ("it was necessary for petitioner to show that the underrepresentation of women, generally and on his venire, was due to their systematic exclusion in the jury-selection process"); *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008) ("defendants must show more than that their particular panel was unrepresentative"); *McGinnis v. Johnson*, 181 F.3d 686, 690 (5th Cir.1999) ("one incidence of a jury venire being disproportionate is not evidence of a 'systematic' exclusion"); *Gardner v. Kapture*, 261 F. Supp. 2d 793, 802 (E.D. Mich. 2003) ("a one-time example of underrepresentation of a distinctive group wholly fails to meet the systematic exclusion element"). "Merely because the percentage of a distinctive group selected in a single venire does not mirror the percentage of the group in the entire community cannot be construed as systematic exclusion." *See United States v. Allen*, 160 F.3d 1096, 1103 (6th Cir. 1998) (must show more than that a particular panel was unrepresentative of the community); *Ford v. Seabold*, 841 F.2d 677, 685 (6th Cir. 1988); accord *United States v. Martin*, Nos. 11–5888, 11–5893, 2013 WL 656258, at *16 (6th Cir. Feb. 25, 2013) ("Because [defendants] failed to produce any evidence that under-representation of blacks in [their] venire resulted from systematic exclusion, they did not establish a prima facie case."). Petitioner's bare assertion of systematic exclusion does not suffice to show he was denied a fair cross-section. *See United States v. McCaskill*, 48 F. App'x. 961, 962 (6th Cir. 2002); *Wingfield v. Metrish*, No. 4:06-cv-130, 2009 WL 5149936, at *4 (W.D. Mich. Nov. 30, 2000). Petitioner clearly failed to meet this burden. His jury venire challenge, and the ineffective assistance claim based thereon, must therefore be rejected.

It is well established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland*, 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); accord *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004). A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).

Courts have not hesitated to find ineffective assistance in violation of the Sixth Amendment when counsel fails to conduct a reasonable investigation into one or more aspects of the case and when that failure prejudices his or her client. For example, in *Wiggins v. Smith*, 539 U.S. 510, 524-29 (2003), the Supreme Court held that the

petitioner was entitled to a writ of habeas corpus because his counsel had failed to conduct a reasonable investigation into potentially mitigating evidence with respect to sentencing. *Id.* According to the Court, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentence strategy impossible." *Id.* at 527-28. Consistent with *Wiggins*, the Sixth Circuit has held, in a variety of situations, that counsel's failure to investigate constituted ineffective assistance in violation of the Sixth Amendment. *See, e.g., Towns*, 395 F.3d at 258-59 (holding that defense counsel's failure to investigate potentially important witness in robbery and felony murder trial was unreasonable, and thus constituted ineffective assistance, in violation of Sixth Amendment); *Combs*, 205 F.3d at 287-88 (holding that defense counsel was constitutionally ineffective for failing to investigate adequately his own expert witness, who testified that, despite the defendant's intoxication at the time of the crime, the defendant nevertheless was capable of forming the requisite intent to commit the crimes); *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992) (holding that counsel was constitutionally ineffective for failing to conduct an investigation into certain physical evidence that would have undermined the prosecution's theory that the victim was shot at a distance); *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) (holding that counsel's failure "to investigate a known and potentially important alibi witness" constituted ineffective assistance because "[c]ounsel did not make any attempt to investigate this known lead, nor did he even make a reasoned professional judgment that for some reason investigation was not necessary"); *see also Clinkscale*, 375 F.3d at 443 (collecting cases in which counsel's

failure to investigate a potentially important witness constituted ineffective assistance).

The Michigan Court of Appeals found that Petitioner could not succeed on this claim:

> Defendant also argues that defense counsel was ineffective for failing to obtain the complete video footage contained on the bank's surveillance cameras from the day of the robbery. However, defendant has failed to establish that counsel actually failed to obtain the video footage. As discussed, *supra*, the record indicates that counsel possessed all the bank surveillance video footage. Accordingly, defendant has failed to established the factual predicate for his claim. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

(9/8/11 MCOA Op., ECF NO. 9-17, PageID.1115.) The court of appeals' decision appears to be factually sound and legally correct. During a pretrial hearing, Petitioner's counsel stated on the record that he had the videotapes from the robbery. (4/9/10 Mot. Hr'g, ECF No. 9-8, PageID.194.) Petitioner appears to contend that there are additional tapes that would disprove the armed robbery charge because they would show he did not possess a weapon during the robbery and that he did not approach the witnesses in this case or take money. (*See, e.g.,* PageID.21, 1173.) But the prosecution never contended that Petitioner actually possessed an explosive device or any other weapon. Rather, the evidence regarding the weapon in this case was based on witness

testimony concerning Petitioner's oral statements made at the bank. To the extent Petitioner is arguing that the tapes would support his contention that he did not make the statements in question, but was instead making reference to the dye pack, such would be to no avail. The testimony produced at trial clearly established that none of the cameras at the bank had audio recording capabilities out of consideration for customer privacy. (Trial Tr. III, ECF No. 9-11, PageID.674.) Petitioner has not demonstrated otherwise. Finally, Petitioner fails to establish the presence of video tapes that would have shown his interactions behind the teller line. To the contrary, the testimony at trial was that the video cameras were trained only on common areas open to the public, and did not focus on the teller drawers or employee areas. (*Id.* at PageID.669.)

For all the above reasons, the court finds Petitioner's "failure to investigate" is without merit.

### (3)    *Testimony During Separate Trial*

Next, Petitioner contends that his counsel rendered ineffective assistance when he left him alone to testify at the separate trial of his co-defendant. It does not appear that Petitioner raised this ineffective assistance claim in the state courts. Moreover, because he has already filed his one allotted motion for relief from judgment, it appears this argument is procedurally defaulted. But even excusing Petitioner's default, his claim fails on the merits. Indeed, despite claiming he was left alone, Petitioner appears to admit that his counsel asked him, albeit before he was brought into the courtroom, whether he wished to testify at that trial, and Petitioner indicated that he

did. (Pet., ECF No. 1, PageID.21.) Thus it does not appear that his counsel left him alone during these proceedings. But even if Petitioner could somehow show his counsel acted below an objective standard of reasonableness, he utterly fails to demonstrate he was prejudiced by it. The testimony in question was given during a separate trial in front of a separate jury. He points to nothing by which the Court could conclude his testimony prejudiced him during his own trial. Accordingly, this argument should be denied.

### (4)     Armed Robbery Charge

Petitioner's final allegation concerning his trial counsel is somewhat difficult to comprehend. He states that,

> "on or about March 10, 2010, and subsequent to a February 11, 2010 discussion between Petitioner and attorney regarding Petitioner's desire to obtain bank video footage which Petitioner asserted would show a lack of evidence to support the first and second elements of the charge of armed robbery prosecutor Bader filed a motion to amend and added a second charge (e.g. bank robbery) while Attorney Balgooyen simultaneously filed a motion to withdraw a[s] counsel."

(PageID.21-22.) The Court is unable to discern how his counsel could have been ineffective due to the act of the prosecutor. To the extent, however, that Petitioner is referring to the argument raised in his Standard 4 brief (PageID.1170), asserting that his counsel was ineffective for failing to present other interpretations of Petitioner's statements regarding a bomb to the jury and for failing to submit a "Motion for Judgment" to the trial court, I find no error.

The Michigan Court of Appeals discussed these claims as follows:

Defendant first argues that defense counsel was ineffective because counsel failed to adequately present a defense to the charge of armed robbery. Specifically, defendant claims that counsel should have explained to the jury that when defendant was talking about a "bomb" he was talking to himself about avoiding a "bomb pack" and was not claiming to have a weapon. However, this Court has held that "[d]ecisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy." *People v Horn,* 279 Mich App 31, 39; 755 NW2d 212 (2008). Defense counsel's decision not to emphasize the fact that defendant was talking about a "bomb" in any context was a legitimate trial strategy. Thus, defendant has not overcome the strong presumption of trial strategy. *People v Matuszak,* 263 Mich App 42, 58; 687 NW2d 342 (2004). Moreover, we note that defense counsel allowed defendant to testify as to his claim that he used the word "bomb" when talking aloud to remind himself to avoid a "bomb pack."

Defendant also argues that defense counsel was ineffective because counsel failed to move for a directed verdict on the armed robbery charge. Defendant argues that because there was insufficient evidence, the trial court would have granted a directed verdict if counsel had asked for one. In *People v Riley,* 468 Mich 135, 141-142; 659 NW2d 611 (2003), the Supreme Court explained that "[b]ecause the prosecution submitted sufficient evidence . . . defense counsel was not ineffective for failing to make a motion for a directed verdict." Here, as discussed, *supra,* the prosecution submitted sufficient evidence to support defendant's armed robbery conviction. Thus, defense counsel was not ineffective for failing to move for a directed verdict. Counsel had no obligation to bring a frivolous or meritless motion. *People v Darden,* 230 Mich App 597, 605; 585 NW2d 27 (1998).

Defendant further argues that defense counsel was ineffective because counsel failed to effectively cross examine the witnesses regarding exactly what defendant said while he was in the bank. However, defendant has not shown that counsel's decisions regarding how to cross examine the witnesses constituted anything other than reasonable trial strategy. *Horn*, 279 Mich App at 39.

(9/8/11 MCOA Op., ECF No. 9-17, PageID.1114-1115.) The Michigan Court of Appeals' decision is entirely consistent with *Strickland* and its progeny. Petitioner's counsel thoroughly questioned the prosecution witnesses regarding what they heard. Trial

counsel's decision on the manner of questioning is presumed to be trial strategy, and Petitioner has failed to overcome the presumption. Furthermore, to the extent Petitioner claims his counsel should have moved for a directed verdict, for reasons stated more fully below, there was overwhelming evidence of Petitioner's guilt produced at trial and any motion for acquittal would certainly have failed. Counsel's failure to raise a meritless issue does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000). "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).

For all the above reasons, the Michigan Court of Appeals' decision rejecting Petitioner's ineffective assistance of trial counsel claims is neither contrary to, nor an unreasonable application of, *Strickland*.

## B. Appellate Counsel

Separately, Petitioner contends that his appellate counsel was ineffective for failing to raise on appeal Petitioner's challenges to the effective assistance of trial counsel. It is well understood that where a claim lacks merit, appellate counsel is not ineffective in declining to raise the issue on direct appeal. *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit."); *Burton v. Renico*, 391 F.3d 764, 781-82 (6th Cir. 2004) (where claim of

prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal). An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

As fully discussed in the preceding section, Petitioner fails to demonstrate that trial counsel rendered ineffective assistance of counsel. Thus it cannot be said that the issues not presented were clearly stronger than the issues that were. His claim of ineffective assistance of appellate counsel therefore fails as well.

### 3. Sufficiency of the Evidence

A Section 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Id.* at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

In his last ground for habeas relief, Petitioner contends there was insufficient evidence to sustain his armed robbery conviction. The Michigan Court of Appeals disagreed:

> Defendant next argues that there was insufficient evidence to sustain his armed robbery conviction. We review a challenge to the sufficiency of the evidence de novo. *People v McGhee,* 268 Mich App 600, 622; 709 NW2d 595 (2005). The evidence is viewed in a light most favorable to the prosecution to determine whether a rational jury could find that each element of the crime was proved beyond a reasonable doubt. *People v Nowack,* 462 Mich 392, 399-400; 614 NW2d 78 (2000).
>
> "The elements of armed robbery are: (1) an assault and (2) a felonious taking of property from the victim's presence or person (3) while the defendant is armed with a weapon." *People v Smith,* 478 Mich 292, 319; 733 NW2d 351 (2007). An oral representation that a defendant is in possession of a dangerous weapon is sufficient to satisfy the third element. MCL 750.529; *People v Chambers,* 277 Mich App 1, 6; 742 NW2d 610 (2007).
>
> Defendant specifically challenges the evidence supporting the element that he was armed. He claims that he did not orally represent that he had a bomb, and that he, in fact, did not have a bomb or any other weapon. Defendant does not deny that he said the word "bomb," but argues that the reason he said the word "bomb" was because he was talking to himself and reminding himself that he should avoid a "bomb pack." However, when the sufficiency of the evidence is challenged, the evidence is viewed in the light most favorable to the prosecution. *Nowack,* 462 Mich at 399-400. When the evidence is viewed in the light most favorable to the prosecution, there was sufficient evidence to prove that defendant claimed he had a bomb. Several witnesses testified to hearing defendant yell that he had a bomb. Thus, there is sufficient evidence to support defendant's armed robbery conviction.

(9/8/11 MCOA Op., ECF No. 9-17, PageID.1113-1114.) The Michigan Court of Appeals cited *People v. Nowack,* 614 N.W.2d 78 (Mich. 2000) for the sufficiency standard. That case cites *Jackson* as the source of the standard. *Id.* at 81. Thus it cannot be said that

- 44 -

the standard applied by the court of appeals was contrary to clearly established federal law.

In its application of the *Jackson* standard, the court of appeals carefully reviewed the evidence, considering that evidence in a light most favorable to the prosecution. The court's entire analysis is quoted above. The analysis on its face is consistent with, not contrary to, clearly established federal law. The factual findings with respect to the evidence offered by the prosecutor appear to be reasonable. Indeed, Petitioner does not even attempt to find fault with the state court's application of the *Jackson* standard or its factual findings. Instead, his entire argument depends on an assessment of his credibility against the credibility of numerous prosecution witnesses, an assessment this Court is not permitted to make on habeas review. *Herrera*, 506 U.S. at 401-02. It is Petitioner's argument, not the state court's determination, that is a patently unreasonable application of the *Jackson* standard.

Finally, to the extent Petitioner challenges the state court's interpretation of the armed robbery statute, he cannot succeed here on habeas review. "[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES). The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 562 U.S. at 5;

*Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Therefore, Petitioner's challenge to the sufficiency of the evidence has no merit.

## **Certificate of Appealability**

Even though I have concluded that Petitioner's habeas petition should be denied, under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could not conclude that this Court's denial of Petitioner's claims would be debatable or wrong. Therefore, I recommend that a certificate of appealability should be denied.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.


Dated:  August 3, 2017          /s/  Phillip J. Green
                                PHILLIP J. GREEN
                                United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008). General objections do not suffice. *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).